**W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**AMERICAN GUILD OF VARIETY ARTISTS, Defendant.**

**No. 66 Civ. 797.**

United States District Court
S. D. New York.

Jan. 18, 1967.

528

Robert M. Morgenthau, U. S. Atty., by Martin P. Solomon and Alan G. Blumberg, New York City, for plaintiff.

William Power Maloney, New York City, for defendant.

## OPINION

MOTLEY, District Judge.

This action was commenced on March 18, 1966 by the Secretary of Labor to have this court set aside as invalid the June-September 1965 election of officers

and board members of a labor organization, the American Guild of Variety Artists (AGVA), and to direct a new election under the supervision of the Secretary in accordance with the provisions of Title IV of the Labor Management Reporting and Disclosure Act of 1959 (LMRDA) (29 U.S.C. §§ 481–483).

The Secretary's complaint alleged that AGVA violated Section 401(c) of Title IV LMRDA (29 U.S.C. § 481(c)) in the conduct of the challenged election by: 1) discriminating in favor of certain candidates and against other candidates with respect to the use of lists of members of AGVA, and 2) failing to provide for timely distribution of campaign literature in response to candidates' reasonable requests. The complaint further alleged that these violations may have affected the outcome of the election. LMRDA, Title IV, Section 402(c) (2) [29 U.S.C. § 482(c) (2)].

AGVA denied in its answer but subsequently admitted that it is a national labor organization engaged in an industry affecting commerce as defined by Section 3(i), (j) LMRDA (29 U.S.C. §§ 402(i), (j)) and, therefore, its elections are subject to the provisions of Title IV.[1]

AGVA challenged the propriety of the exercise of jurisdiction by this court in three affirmative defenses in its answer relating to the question of exhaustion of administrative remedies. These defenses are, in essence, as follows: 1) the complaining members of the union failed and refused to produce proofs or witnesses in support of their case upon invoking their internal remedies, 2) two of the complaining members admitted on the January 17, 1966 hearing that they had no proof or witnesses to support their claims, 3) AGVA continued to investigate the 1965 election complaint, although the complaining members had appealed to the Secretary on January 19, 1966, and duly notified complainants that it had found no evidence to support any of their claims.

In its answer, AGVA also denied that probable cause existed for the Secretary to believe that violations of Title IV had occurred during the conduction of its 1965 election and challenged the sufficiency of the Secretary's basis for finding probable cause.

Since this court cannot proceed to the merits of this controversy without its jurisdiction having been properly invoked by the Secretary, these needling jurisdictional considerations are disposed of first.

The Secretary's authority and consequent power to invoke the jurisdiction of this court to achieve the objective of having AGVA's 1965 election declared void and a new election directed to be held under his supervision is defined by Title IV, Section 402, LMRDA (29 U.S.C. § 482), Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964).

The first provision of this section, 402 (a), provides that a complaint may be filed with the Secretary by a member of

---

1. Defendant's Admission of Facts dated December 9, 1966.

AGVA also suggested at a pretrial conference on October 28, 1966 that this action had become moot. This suggestion was based on the fact that in 1966 there had been another election. That election was for one third of the members of the Board of Directors of AGVA who are elected each year to serve a three year term. AGVA Constitution, Article VIII. In 1965 the officers were elected for a two-year term expiring in September 1967. At that time, one third of the Board members were elected for a three-year term expiring in 1968. This court ruled prior to trial that since all the officers and directors elected in 1965 were still in office, this cause was not moot. Wirtz v. Local 410, 366 F.2d 438 (2d Cir. 1966).

In its proposed findings of fact AGVA says: "21. All persons certified by AAA as having been elected at the 1965 election took their respective offices or positions and are serving AGVA in such capacity at present."

An expedited trial of this cause to avoid the possibility of mootness was held on December 15, 16, 19, 20 and 21, 1966, in accordance with the directives of the Court of Appeals of this Circuit in Wirtz v. Local 410, supra.

a union complaining of the conduct of an election as violative of Title IV. Such complaint may be filed with the Secretary within one calendar month after one of two occurrences: 1) after the complaining member "has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body" or, 2) after the complainant "has invoked such available remedies without obtaining a final decision within three calendar months of their invocation".

The second provision of this section, 402(b), requires the Secretary to investigate the aggrieved member's complaint and, "if he finds probable cause to believe that a violation of this subchapter (Title IV) has occurred and has not been remedied," he "shall" file suit seeking the relief described above within sixty days after the filing of such complaint.

This court finds that on September 11, 1965 the American Arbitration Association (AAA), which conducted the election for AGVA, concluded its count of the ballots. On October 4, 1965, within thirty days of such completed count, as required by AGVA's constitution, three candidates for office and members in good standing, Don George, Margie Coate, and Frances Gaar, filed a written complaint with AGVA alleging several violations of Title IV.[2] Filing of this complaint was acknowledged by letter from the union's National Administrative Secretary, Warren Bailey, on the same date on which it was filed.

The organization's constitution required it to set a date for a hearing on this complaint within twenty days after October 4, 1966, the date of filing. This was not done.

Under AGVA's constitution, such hearing could have been held before the National Board, the National Executive Committee or a Trial Board, consisting of not less than three National Board members or other members appointed by the National Executive Committee.[3]

At the October 12, 1965 meeting of the National Board, the first meeting after the election, at which the members' complaint was before it, Warren Bailey was discharged and Richard Jones employed by the newly elected officers as National Administrative Secretary.

Subsequently, Mr. Jones, by letter dated December 3, 1965, advised Mr. George that the National Executive Committee had set a hearing on his complaint for December 13, 1965. This letter was not received by Mr. George until December 6, 1965. The union's constitution requires ten days written notice of such hearing.[4] On December 7, 1965, Mr. George, by letter, requested a postponement. He later explained in his complaint to the Secretary that December 13 was a date on which all complainants were scheduled to appear in Saranac Lake, New York, and AGVA was aware of this.

It was not until December 22, 1965 that Mr. Jones acknowledged receipt of Mr. George's letter of the 7th. On this date, AGVA scheduled a new hearing before its National Executive Committee for January 17, 1966. Ninety days from the filing of Mr. George's complaint without final decision would expire on January 4, 1966. AGVA's letter to Mr. George setting this late hearing date indicates that AGVA was aware of this time element when it wrote its December 22, 1965 letter. In that letter Mr. Jones reminded Mr. George that the union was ready to proceed on December 13, 1965 and that it was he, Mr. George, who caused a postponement. But the facts are that the union had not set a hearing date within 20 days of receipt of Mr. George's complaint as required by its constitution. And, it was the union which set the new hearing date after January 4, 1966, the expiration of the ninety day period—not Mr. George.

2. Article XX(A).

3. Article XX(B).

4. Article XX(B).

In the face of the statute it should be the union's expectation that its failure to process the complaint and render a final decision within 90 days would give rise to a right to complain to the Secretary.

January 17, 1966 was chosen as the December 22, 1965 letter indicates on the apparent theory that it was necessary for the National Executive Committee Meeting, scheduled once a month, to hear this complaint.[5] The letter states that January 17, 1966 was one day prior to the regularly scheduled meeting of the Committee. But such delay was contrary to the policy of AGVA's constitution which seeks to avoid such delays by making adequate provision for prompt hearings.

The AGVA constitution provides:

For the purpose of assuring prompt hearings, all hearings authorized or directed in the Constitution to be heard by the National Board or National Executive Committee may, in the discretion of such Board or National Executive Committee, be referred to a Trial Board, consisting of not less than three National Board members, who shall be appointed by the National Executive Committee, for the purpose of hearing and decision. The decision of such Trial Board shall be deemed to be the decision of the National Board.

The Board or National Executive Committee may, in its sole discretion, appoint members in good standing other than National Board Members as some or all of the Members of such Trial Board in any case. Article XX(b)

Don George appeared at the hearing on January 17, 1966. He admitted that he had no personal knowledge of the matters alleged in the complaint and had received the information on which his complaint was based from the two other complaining witnesses and another union member, Arthur Tracy. Frances Gaar, a complaining member, also appeared and testified at the hearing. She was examined by AGVA's attorney, Mr. Maloney. Miss Coate, another complaining member, also appeared.

No final determination, in writing, was ever given to the complaining members by the union following this hearing as required by its constitution. AGVA's constitution provides that: "A final determination of the complaint must be made within (10) days after the hearing shall be closed and notice of the decision must be given to the respective parties, in writing." [6]

On January 19, 1966, Don George filed a complaint with the Secretary which incorporated by attachment the original complaint to the union alleging several violations of Title IV.

The manifest purpose of the ninety day provision was to protect complaining union members from precisely the kind of delay which the union here permitted; otherwise the first provision of Section 402, i. e. 402(a), (29 U.S.C. § 482(a)) requiring exhaustion of internal union remedies would have stood alone. The legislative history supports this conclusion. The Senate Labor Committee in its report upon this bill stated with reference to this provision:

In filing a complaint the member must show that he has pursued any remedies available to him within the union and any parent body in a timely manner. This rule preserves a maximum amount of independence and self-government by giving every international union the opportunity to correct improper local elections. If the member is denied relief by the union or can obtain no decision from the union one way or the other within 3 months, he may complain to the Secretary. Since time is of the essence, no com-

5. AGVA Constitution, Article VII, Section 8. The Board meets every four months. Id. Section 6.

6. Article XX(B).

plaint may be entertained which is filed more than 1 month after the union has denied a remedy or the three month period has expired.[7]

■ The George complaint was, therefore, properly and timely filed.

■ In its answer, AGVA alleged that the complaining members did not exhaust the union's remedies because they failed to produce proofs or witnesses in support of their claims at the hearing on January 17, 1966; that George and Gaar admitted that they had no proof or witnesses; that Coate refused to testify and walked out of the hearing.

The union's constitution did not require production of proofs or witnesses. The constitution merely provides that "an opportunity to be personally present to present—evidence and—witnesses, if any, at such hearing or hearings" shall be given.[8] There is nothing in this record to sustain the allegation that Miss Gaar admitted on the January 17, 1966 hearing that she had no proofs or witnesses or that Miss Coate refused to testify. AGVA did not produce on the trial the minutes of the hearing of January 17, 1966. There is consequently no proof in the record, other than Mr. George's admission regarding his knowledge, as to what took place on January 17, 1966. There is no statutory requirement in Title IV that the complaining members present proofs or witnesses. And complaining members have been given no power to subpoena witnesses or the production of documents. Only the Secretary has been given this power. LMRDA, Title VI, § 601 (29 U.S.C. § 521). Wirtz v. Local 191, 321 F.2d 445 (2d Cir. 1963). Here, the complaining members did present to their union a four page lawyer-like complaint alleging several violations

of Title IV and detailed allegations of fact in support thereof.

The Court's language in Wirtz v. Local Union 169, 246 F.Supp. 741, 751–752 (D. Nev.1965) is applicable here:

The act should receive a practical interpretation governed by common sense and realities. If Congress intended that the union member assert a lawyer-like protest to the Executive Board, covering all the bases by specific averment, and buttressed by evidence of all irregularities in the election, there would be no occasion for an evidentiary investigation by the Secretary. Such an interpretation restricts the Act to a definition of remedies and establishment of jurisdiction in this Court for the vindication of essentially private rights, and de-emphasizes to the point of emasculation the public interest which prompted Congress.

In addition to the foregoing, it should be noted that these lay members were required to appeal to their adversaries, the officers and members of the Board whom the complaining members charged were unlawfully elected.[9]

The members' complaint was investigated by the Secretary. As a result of that investigation, probable cause was found to believe that violations of Title IV had occurred in the conduct of the 1965 election. Thereafter, this suit was instituted within sixty days of the filing of the members' complaint by Mr. George.

■ The right to bring this suit was the right of the Secretary of Labor, and if predicated upon the filing with him of a complaint by a union member within one calendar month after the expiration of ninety days from the filing of a complaint with the union on which no

---

7. Legislative History of the Labor Management Reporting and Disclosure Act of 1959, p. 417, U.S.Code Cong. & Admin. News 1959, p. 2318.

8. Article XX(B).

9. The court questions whether under these circumstances these complaining mem-

bers would have been required to appeal to the very persons whose election they challenged had they refused to do so. Cf. Farowitz v. Associated Musicians of Greater New York, 241 F.Supp. 895 (S.D.N.Y.1965). Contra, Wirtz v. Local Union No. 125, 231 F.Supp. 590 (N.D. Ohio 1964).

final decision has been rendered, the Secretary's right to proceed under Title IV, Section 402(b) LMRDA (29 U.S.C. § 482(b)) cannot be defeated. Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964).

■ The suggestion of AGVA that this court should not exercise its jurisdiction in this cause since the Secretary had no basis for an investigation or for finding probable cause is unsustainable. This court has previously ruled: "As in other statutes, an action is commenced if the Secretary 'finds probable cause'. His determination as to this is conclusive; defendant cannot question in this Court either his investigation or his determination of probable cause." Wirtz v. Local 30, 34 F.R.D. 13, 14 (S.D.N.Y. 1963). Accord: Wirtz v. Local 30, 242 F.Supp. 631, 633 (S.D.N.Y.1965), reversed and remanded on other grounds, 366 F.2d 438 (2d Cir. 1966).

This court concludes that neither the facts in this case nor the applicable law sustains the union's attack on the propriety of the exercise of this court's jurisdiction. Such propriety having been established and trial on the merits of the Secretary's complaint having been held, this court must now proceed to a determination of the question whether the Secretary has succeeded in establishing, by a preponderance of the evidence, that Title IV provisions were violated in the conduct of AGVA's 1965 election, and that there exists in this case "a reasonable probability" that these violations "may have affected the outcome of the election". LMRDA, Title IV, Section 402 (c) (2) (29 U.S.C. § 482(c) (2)), Wirtz v. Local 410, 366 F.2d 438 (2d Cir. 1966).

The section of the LMRDA on which the Secretary rests his case provides as follows:

"Every national or international labor organization, except a federation of national or international labor organizations, and every local labor organization, and its officers, shall be under a duty, enforceable at the suit of any bona fide candidate for office in such labor organization in the district court of the United States in which such labor organization maintains its principal office, to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members, and whenever such labor organizations or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution. Every bona fide candidate shall have the right, once within 30 days prior to an election of a labor organization in which he is a candidate, to inspect a list containing the names and last known addresses of all members of the labor organization who are subject to a collective bargaining agreement requiring membership therein as a condition of employment, which list shall be maintained and kept at the principal office of such labor organization by a designated official thereof. Adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots." (29 U.S.C. § 481 (c)).

The facts established upon the trial are the following:

AGVA, acting pursuant to its constitution, held a mail ballot election of officers and one third of its board members August 9 through September 11, 1965. Candidates competing in this election were divided among three slates: the Haley slate, the Davis slate, and the Valentine-Swann slate. This controversy

centers around candidates' requests for campaign mailings by the union and the use of AGVA's membership list for purposes of mailing campaign literature to the membership at large.

Election procedures for the selection of AGVA's national officers commenced with the nomination of candidates at a convention held in Toronto in June 1965. The nominees were officially notified by the Minutes, Meetings and Elections Department of AGVA of their nomination. They were required to file written acceptances on or before July 8, 1965. The notification form specifically stated that acceptances should be mailed to the "Elections Dept., AGVA, 551 Fifth Avenue, New York, N. Y. 10017."

On June 30, 1965, Mr. Alvin Brandt, the head of the Minutes, Meetings and Elections Department of AGVA, advised Mrs. Margaret Carlson of AAA that AGVA proposed to have the ballots mailed for the election on August 2 and 3 and that the deadline for receipt of ballots and tallying votes was September 11. The date of mailing the ballots was subsequently changed to August 9.

H. J. Keenan, head of AGVA's Membership Department, wrote Mrs. Carlson on July 8, 1965. He informed Mrs. Carlson that AGVA was requesting the Midtown Letter Company (Midtown) to supply, for use in the election, the following items: 1) two sets of labels containing the names and addresses of AGVA members (to be used by AGVA for mailing the AGVA News) and 2) one set of labels to be used by AAA in mailing the ballots and tissue sheets of said names and addresses to be used by AAA "for election purposes and at the same time to be used as the candidates' inspection list." The labels and the sheets were prepared from membership cards of the members in good standing. One set of labels and the tissue sheets were received by AAA and two sets of labels were received by AGVA sometime during the latter part of July, 1965 when the mem-

bership cards were returned. AGVA used one set of labels on the July-August AGVA News campaign issue mailed July 29–30. This issue contained full page advertisements by each slate.

On the afternoon of July 8, 1965, the last day to file acceptances, Richard Jones, made repeated inquires of the Elections Department concerning the names of those candidates who had filed. Finally, at 4:47 P.M., Mr. Jones, himself, filed the acceptances of Jack Haley for president and Penny Singleton for vice president. Mr. Jones filed these acceptances at the request of Mr. Haley and Miss Singleton who had sent them to him with an accompanying note from Miss Singleton, the contents of which Mr. Jones could not recall.

On July 13, 1965, Warren S. Bailey, of AGVA, wrote Mrs. Carlson formally authorizing AAA to conduct the election.[10]

At no time did AGVA further instruct AAA as to what the list of members was to be used for or as to what procedures were to be followed in the event that two or more candidates simultaneously sought access to the membership list.

The heart of this election dispute involves events from August 4 through August 13, 1965. Candidates of the various slates were endeavoring during this period to get campaign material mailed out.

Mrs. Carlson testified that the usual procedure of AAA with respect to requests by a candidate for the mailing of campaign literature was as follows: AAA asks the candidate which mailing house he desires to use. This is for the purpose of determining whether the house is a union shop and a reliable organization. If the mailing house meets these criteria, the membership list is hand delivered to it for typing. As soon as the list is typed, it is returned by hand to AAA. If the mailing house is found to be either unreliable or not a

---

10. AGVA had similarly authorized AAA to conduct its national election in 1964.

union shop, AAA refuses to turn over the mailing list.[11]

On August 4, 1965, Frances Gaar, representing the candidates on the Sammy Davis, Jr. slate, telephoned Alvin Brandt. Mr. Brandt being away on vacation, she spoke with his assistant, Mr. Higgins. Miss Gaar told Higgins that she wanted to send out a campaign mailing for the Davis slate and desired the assistance of the union in this regard. Mr. Higgins claimed that he knew very little about this and that there was no membership list available in his office. Mr. Higgins suggested that Miss Gaar call Mr. Keenan, head of the Membership Department, and AAA which was handling the election.

On the same day, August 4, Miss Gaar called Mr. Keenan. She asked his help in having a membership list available for her campaign mailing. Mr. Keenan told her that this was not his department but under Mr. Brandt's authority. Mr. Keenan suggested that Miss Gaar call AAA.

Miss Gaar next called Mr. Bailey (the first of at least 20 calls to Mr. Bailey on the subject). Mr. Bailey referred Miss Gaar to AAA stating: "They should be able to get out your membership envelopes for you." This conversation took place about 5 P.M. on August 4.

Miss Gaar immediately called AAA and asked for the person in charge of AGVA's election. Mrs. Carlson was out of town for several days. Then Miss Gaar spoke with a vice president and told him what she wanted. This conversation did not produce results. Mrs. Valerie Priestly, secretary to Mrs. Carlson, was the next person from whom Miss Gaar sought to achieve her objective on August 4, 1965. Miss Gaar told Mrs. Priestly she wanted a campaign mailing for her slate and asked for assistance, stressing that union officials referred her to AAA for campaign mailing purposes since AAA had the mailing list and had a duty to help

her get out her mailing. This endeavor to secure the list also proved futile.

The next day, August 5th, Frances Gaar called Mrs. Priestly, again, around the noon hour. After a lengthy conversation with Mrs. Priestly, Miss Gaar again failed to receive a copy of the membership list. She did, however, learn that the list had been sent to the Fifth Avenue Letter Company (Fifth Avenue).

On August 5, Mr. Jones, intervening on behalf of the Haley slate, secured the transfer of the tissue sheets containing the names and addresses of union members from AAA to Fifth Avenue for the purpose of having that company prepare a mailing for the Haley slate. This transfer was effected by Mr. Jones either personally picking up the list and hand delivering it to Fifth Avenue or by calling Mrs. Priestly, identifying himself, and directing her to have it hand delivered. On the same day, Mr. Jones wrote a letter to Fifth Avenue authorizing it to enclose a *Variety* newspaper reprint in the Haley campaign literature. This was done, Jones testified, at the request of either Jack Haley, the then vice president of AGVA and candidate for president, or Will Aherne, Haley's campaign manager.

On August 5, Jones received a call from Fifth Avenue advising him that another candidate desired the list. Jones replied to Fifth Avenue that it could not give the list to anyone else and any other candidate who desired the list would have to go to AAA. He told Fifth Avenue it could not give the list to Miss Gaar after it was copied.

After learning the whereabouts of the AGVA list on August 5, Miss Gaar spoke with Mr. Friedman of Fifth Avenue in quest of the list. She told him she wanted a campaign mailing. She learned that the list was being copied (typed) for the Haley slate mailing onto individual envelopes. In response to her request for a similar reproduction of the list, she was advised that Fifth Avenue would

11. A request from the Valentine-Swann slate was refused on these grounds.

only work on one slate's mailing at a time. She was also told that the company would not be finished with the list until next Tuesday, August 10.

Miss Gaar again spoke with Mr. Bailey immediately following her conversation with Fifth Avenue. She complained about the fact that AAA had given the list to Fifth Avenue and the slow process of reproduction which would make the list unavailable until Tuesday, August 10. Bailey suggested Miss Gaar call Midtown which might be able to help her get a list.

Pursuant to Mr. Bailey's suggestion, Miss Gaar telephoned Mr. Schneider or Mr. Fels of Midtown on Thursday afternoon, August 5. This conversation did not enable Miss Gaar to receive the membership list.

Miss Gaar next telephoned Mr. Keenan again. She told Mr. Keenan that contrary to what he had said about there being no list, Midtown said it had sent back the list to AGVA. Mr. Keenan admitted there was a list in the possession of the union but said it was for the use of the union in its mailings and could not be used for campaign purposes. The list to which Keenan referred was the second set of labels secured from Midtown in the latter part of July and which was to be used for a post election mailing of AGVA News in October. It should be noted that Mr. Keenan also had returned to him by Midtown the membership cards from which these labels were prepared. However, following this conversation, Miss Gaar did not receive a copy of the union membership.

Frances Gaar then spoke with Arthur Tracey, a Davis slate candidate for vice president. She asked him to check on the information she had received from Mrs. Priestly and Mr. Friedman of Fifth Avenue regarding the availability of the membership list so that someone else would have the same information she had acquired.

In addition to Frances Gaar's efforts to obtain the mailing list, Arthur Tracey tried to secure the list for a mailing. On Friday, August 6, Mr. Tracey had conversation with Mrs. Priestly of AAA, Mr. Friedman of Fifth Avenue, Mr. Bailey, and Mr. Maloney, AGVA's counsel. Mr. Bailey told Mr. Tracey that he could be of no help, as Richard Jones, then Assistant National Administrative Secretary, was the boss. Mr. Maloney told Tracey that there was nothing he could do, and added: "First-come, first-served. They've got it, there is nothing I can do about it." That day, Mr. Tracey threatened Mrs. Priestly with a law suit unless the list was produced.

On Friday morning, August 6, Miss Gaar again called Mr. Bailey and suggested to him that the ballots be held up so that there could be a fair election. Mr. Bailey responded that he could not take such responsibility, that such a decision would have to be made by AGVA's lawyer, William Power Maloney. After speaking with Miss Gaar, Bailey called Maloney and suggested to him that the union would have to hold up the ballots in order to prevent serious trouble. According to Bailey, Maloney readily agreed.

After Bailey thought he had Maloney's concurrence, he called Jack Haley and told Haley that he was going to hold up the ballots in order to give the opposition slate an opportunity to get its literature in the mail. Mr. Haley lost his temper, stated that he did not care what Maloney or Bailey thought, and demanded that the ballots go out on schedule. Mr. Bailey advised Mr. Maloney of Haley's attitude and left it up to Mr. Maloney to resolve the dispute.

At about the same time, Miss Gaar telephoned Maloney who told her that the union followed a "first-come, first-served" rule with respect to the use of the membership list and the Haley slate had been first. This, of course, did not concur with the facts as they developed on the trial.

Later Miss Gaar spoke again to Bailey in an attempt to get the mailing of the ballots held up. Late Friday afternoon, Miss Gaar called Mr. Maloney who as-

sured her that he had found a way to have the list for the Davis slate completed by Monday. However, no guarantee was given with respect to holding up either the ballots or the Haley literature if the plans for getting a list by Monday failed.

Over the weekend, Miss Gaar discussed the Maloney plan and the election with Bailey. Bailey advised her that Mr. Maloney had said that he had to get his instructions from the West Coast and that Will Aherne was mailing Maloney "some papers".

Very early Monday morning, August 9, Miss Gaar sent a telegram to AAA demanding that the ballots be held up. Later that morning she telephoned Mrs. Carlson, Midtown, and Fifth Avenue and learned that no one knew anything about Mr. Maloney's plan to have the Davis list ready on that day.

On Monday, August 9, Tracey spoke with Mrs. Carlson and asked her to withhold the mailing of the Haley slate literature until such time as the Davis slate got the list so that the mailings would be simultaneous. He also tried, unsuccessfully, to get the list piecemeal from Fifth Avenue.

As the day passed, Mr. Bailey was unable to reach Mr. Maloney. Mrs. Carlson assured Miss Gaar that she would hold off mailing the ballots as long as she possibly could, i. e., until 7:00 P.M. August 9th.

13,166 ballots were mailed on Monday, August 9th, 433 ballots on Tuesday, August 10th, and 71 on Wednesday, August 11th. The Tuesday and Wednesday mailings were addressed to members who had become eligible to vote after the original list had been prepared.

As an alternative to delaying the mailing of the ballots, Mrs. Carlson sought to hold up the mailing of the Haley literature until the Davis forces could get their literature ready. She telephoned Mr. Bailey, Mr. Maloney, and Fifth Avenue to get them to hold up the Haley mailing. Miss Gaar also telephoned. Mr. Jones testified that Fifth Avenue had been threatened with a law suit by Mrs. Carlson if the Haley literature was not held up and that he, Jones, threatened Fifth Avenue with a law suit if the Haley literature was held up. He also reprimanded Mrs. Carlson for her threat to Fifth Avenue. Fifth Avenue was instructed by Mr. Jones and Mr. Maloney to go ahead with the Haley mailing. Mr. Maloney and Jones instructed Mrs. Carlson that the Haley literature should not be held up. After consulting with its attorneys, Fifth Avenue mailed the Haley literature as follows: 6,000 pieces on August 10, and 7,299 pieces on August 11.

Mrs. Carlson arranged for the membership list, which she received back from Fifth Avenue on August 10, to be reproduced directly onto gummed labels by a Xerox process (which was much faster than the individual typing of envelopes) by Todd Photoprint, Inc. the same day. Todd prepared the labels and delivered them to Midtown "before noon" the next day. It took Midtown seven working hours thereafter to cut these labels because of the irregularity in the shape of the labels resulting from this reproduction method. Midtown got the Davis mailing out as follows: 14,010 pieces on August 13 and 659 pieces on August 17, 1965.

Whether Midtown could have gotten the Davis mailing out on the 12th but held it up one day at the request of the Davis slate so that a Variety newspaper reprint could be inserted is not clear. Miss Gaar testified that Midtown initially told her they would get the mailing out on the 13th and the Variety insertion would cause no delay. A Midtown representative testified from memory that the Davis mailing was held up one day for the Variety insertion.

Meanwhile, the ballots and Haley literature were being received by the members and ballots were being voted. The ballots were returned to AAA in business reply envelopes at the ordinary first-class rate for that type of mailing of seven cents each. It cannot be ascer-

tained when a given ballot which was received was voted. AAA's petty cash slips show the number of ballots received daily, as follows, in part:

| Date | Daily Ballots Received | Total Ballots Received |
|---|---|---|
| Wed., August 11 | 11 | 11 |
| Thurs., August 12 | 99 | 110 |
| Fri., August 13 | 362 | 472 |
| Mon., August 16 | 533 | 1005 |
| Tues., August 17 | 296 | 1301 |
| Wed., August 18 | 207 | 1508 |
| Thur., August 19 | 228 | 1736 |
| Fri., August 20 | 234 | 1970 |

Under the secret ballot procedures followed by AAA, it is not possible to ascertain which members' ballots were received on the respective dates.

On September 11, 1965, the ballots were counted by AAA. In the race for president, Jack Haley defeated Sammy Davis, Jr. by 473 votes. Some other results as to the officers were as follows:

| First Vice President | | |
|---|---|---|
| Margie Coate | 1299 | (Davis) |
| Penny Singleton | 1621 | (Haley) |
| Paul Valentine | 316 | |

| Second Vice President | | |
|---|---|---|
| Joe Evans | 1290 | (Haley) |
| Arthur Tracey | 1174 | (Davis) |
| Johnny Woods | 658 | |

| Recording Secretary | | |
|---|---|---|
| Ann Terry D'Andre | 346 | |
| Roy Rogers | 1446 | (Haley) |
| Sally Winthrop | 1357 | (Davis) |

This court finds from the foregoing facts that AGVA violated specific duties imposed upon it by the LMRDA, Title IV, § 401(c) [29 U.S.C. § 481 (c)], the statute set forth above, in the following respects:

1) AGVA failed to comply with the reasonable request of candidates (the Davis slate) to distribute by mail, at the candidates' expense, campaign literature in aid of the candidacy of these persons to all members in good standing.

2) AGVA discriminated in favor of some candidates (the Haley slate) and against other candidates (the Davis slate) with respect to the use of its membership list for campaign purposes.

3) AGVA failed to provide adequate safeguards to insure a fair election in 1965 by failing to provide for union distribution of campaign literature at the candidates' expense and by failing to instruct AAA with respect to candidates' access to and use of the only membership list furnished AAA.

4) AGVA failed to make adequate provision for the exercise of the right of bona fide candidates to inspect (once within 30 days prior to the election here challenged) a list containing the names and last known addresses of all members subject to a collective bargaining agreement requiring membership in AGVA as a condition of employment. Such a list should have been maintained by a designated official of AGVA at its principal office.

I. The Congress, by the plain terms of section 401(c), put upon AGVA not the choice but the legally enforceable duty to comply with a candidate's reasonable request to distribute campaign literature to the membership by mail, at the candidate's own expense.[12]

Miss Gaar's timely and patently reasonable request for a campaign mailing on behalf of the Davis slate was made on August 4, 1965. This was one day prior to the time when Mr. Jones, acting on behalf of the Haley slate, secured from AAA the only list which AAA had been given for such a purpose. Jones then proceeded to arrange for a Haley slate mailing. Miss Gaar's persistent attempts to secure a mailing by the union or AAA on August 4 produced no results. She made clear to Mr. Bailey, the highest administrative official at AGVA, to AAA's vice president and to Mrs. Carlson's secretary that her purpose in calling them on August 4 was to get out a campaign mailing. There is, consequently, no problem here of failure of communication.

The union, ignoring the statute, had made no preparation for fulfilling the request of a candidate for a campaign mailing by the union, in violation of its unequivocal duty to do so. Consequently, when Miss Gaar, on August 4, spoke to three union employees, Mr. Higgins in the Election Department, Mr. Keenan, head of the Membership Department, and Mr. Bailey, she could not get any assistance from them in mailing her literature. Each in turn referred her to AAA.

Instead of complying with the plain terms of the statute by establishing some machinery to be used by all candidates for distributing campaign literature, AGVA sent to AAA a single list of its membership for this purpose. This list was the tissue sheets which AGVA directed Midtown to send to AAA early in July, 1965. AGVA instructed AAA that this list was to be used "for election purposes and *at the same time* to be used as the candidates' inspection list." (Emphasis added). The union could have instructed its employees to use the

---

12. The Senate Committee on Labor and Public Welfare stated in its report to the Senate favorably recommending S. 1555 (LMRDA) that one of the Bill's guarantees of a fair election was that:
   "Every candidate for local union office is entitled *through use of union mailing lists and distribution machinery* to distribute at his own expense material in support of his candidacy to every member of the union." (Emphasis supplied). Legislative History of the LMRDA of 1959 (1959 Ed.) p. 416.
   The Report further states that the union is "required to comply with all reasonable requests of any candidate for distribution of his campaign literature *by the union* * * *." (Emphasis added) Legislative History of the LMRDA of 1959 (1959 Ed.) p. 442.
   Although the campaign literature provisions of S.1555 referred only to local unions at the time the Committee Report was written and at the time the language in its final form was introduced on the Senate floor by Senator Javits on April 25, 1959 (Leg.Hist. of the LMRDA of 1959 (1959 Ed. p. 1240) the identical language was adopted by the Conference Committee of the House and Senate in its Report of September 3, 1959 Id. pp. 934, 937, 938, and by Congress in the final law, with the sole exception that the coverage of said provisions weer expanded to include national and international labor organizations as well as locals and the provision was amended to provide for a 30 day inspection of the union's membership list.
   Senator McClellan, in expressing his understanding, stated: "This amendment would simply permit him (a candidate) to send his campaign material to the union and have the union mail it out." Id. p. 1240, col. 3. 29 C.F.R. § 452.9 (a) (1965).

same distribution machinery used in mailing the AGVA News to members in good standing.

■ There appears to be no statutory violation involved in AGVA's retaining an independent agency to conduct the election, especially when it is apparently done to insure a fair election. AGVA's duty to comply with a candidate's request to distribute campaign literature, however, is an entirely different matter. It is a duty imposed upon AGVA, not the independent agency, by statute. 29 C.F.R. § 452.9(a) (1965). AGVA, therefore, cannot escape responsibility for a failure to comply.

It was Mrs. Carlson's testimony regarding campaign literature distribution procedures adopted by AAA in the 1965 election which illuminated the facts here. Mrs. Carlson testified that when a candidate requested a mailing, the membership list would be hand delivered to a mailing house designated by the candidate if AAA found the house to be a union shop and reliable. This procedure might have met the test of statutory compliance if AGVA had formally approved this procedure, had advised its employees and the various candidates of same, and had provided adequate safeguards to insure a fair election with respect to this procedure.

The most obvious safeguard which could have been provided was for AGVA to furnish AAA with adequate instructions regarding access to and use of the list by each slate. Other possible safeguards are equally apparent. AGVA was plainly aware that although there were 95 candidates who filed acceptances, these candidates had aligned themselves with one of the three slates, and campaign literature would be sent out on behalf of a slate rather than an individual candidate to the AGVA membership which approached 14,000. Reproduction processes were rapid and readily available as the evidence shows. Three candidates' lists could have been provided at the time AGVA had Midtown make three sets of labels and the tissue sheets containing the names and addresses of the members early in July, 1965. Furnishing AAA with one list for each slate clearly would have avoided all problems, easily anticipated, arising from simultaneous or virtually simultaneous requests from candidates.

Moreover, the union's failure to comply with the statutory mandate here could have been remedied. When it was brought to the union's attention that one slate had gotten the list for campaign mailing purposes to the disadvantage of the other, it could have ordered the ballots held up until the disadvantaged group got its literature ready, a matter of a few days. There was no requirement in AGVA's constitution that the ballots be mailed on a certain day. Mr. Haley, the successful candidate for president, then a vice president of the union, vetoed the suggestion of holding up the ballots. In 1966 the ballots were, in fact, mailed a week later than in 1965.

In the alternative, the union, as suggested by the aggrieved candidates and Mrs. Carlson, could have effected a postponement of the Haley mailing. Haley was at the time a union officer fully cognizant of the problem. Mr. Jones threatened Fifth Avenue with a law suit if the Haley literature was detained. Implementation of one or the other of these alternatives would have prevented an unfair election. The union, aware of the problem and the existence of these alternatives, elected to implement neither one, thus allowing the ballots and the Haley literature to reach the membership before the Davis slate literature was mailed.

■ The evidence, discussed in greater detail, infra, shows that enough members voted before they received the Davis slate literature to present in this case "the existence of a reasonable probability" that this statutory violation " 'may have affected the outcome' of the election." Wirtz v. Local 410, 366 F.2d 438 (2d Cir. 1966). This violation is, consequently, a breach of the statutory duty sufficient to cause this court

to declare the 1965 AGVA election void and to direct a new election.

■ II. AGVA, under the facts of this case, violated a second statutory duty imposed by section 401(c). This was a duty not to discriminate against any candidate with respect to the use of membership lists. 29 C.F.R. 542.9(b) (1965).

AGVA had no intention of complying with its duty to distribute campaign literature. It sought to put the burden of such distribution upon each candidate by making a single membership list available at AAA headquarters instead of the union's principal office as required by statute. A candidate, if he so desired, could inspect the list there, or direct that it be sent to a particular mailing house to be copied for campaign mailing purposes.

Miss Gaar, herself a bona fide candidate acting on behalf of numerous other similar candidates, requested a list of members for campaign mailing purposes from three union employees and from AAA on August 4, 1965.

During the ensuing six days, Miss Gaar, in a series of vexing calls, tried to secure the list. The list was not furnished. The list went to the Haley slate August 5, 1965—the day following Miss Gaar's original request. Miss Gaar did not succeed in obtaining the list until late August 10, 1965. Before noon on August 11, the Todd Photoprint, Inc. furnished Midtown with labels onto which had been xeroxed (copied) the names and addresses of members from the hitherto unavailable tissue sheets. This was two days after the ballots had been mailed. The real discrimination against the Davis slate came from the fact that the Haley literature was already being mailed when the Davis slate received the list.

The Haley slate was not treated to the same vexatious experience in its attempt to obtain the list. On August 5, 1965, the Haley slate, through the good offices of Mr. Jones, promptly secured the list. (One month after the election, the Haley slate installed Jones as National Administrative Secretary). The Haley slate experienced no difficulty whatsoever in obtaining the list from AAA. Jones either personally conveyed the list to Fifth Avenue or had Mrs. Priestly see to its hand delivery to that company. There, each name was separately typed onto a label, providing a more personal and attractive envelope address than was eventually possible for the Davis slate under the circumstances.

On August 5, when Mr. Jones secured the list for the Haley slate, he immediately authorized Fifth Avenue to insert a Variety newspaper reprint in a "No. 11 envelope". He claimed he was acting at the request of the Haley slate. Jones, consequently, not only preempted the list for the Haley slate but facilitated its use by that slate. This resulted in the Haley slate literature reaching the voters promptly after receipt of the ballots. No such assistance was offered the Davis slate by Jones or any other AGVA employee to whom Miss Gaar had appealed for help.

On the contrary, Jones undertook to block acquisition of the list by the Davis slate. Fifth Avenue advised Jones on August 5 that someone else (Miss Gaar) wanted the list. Jones instructed Fifth Avenue that it could not deliver the tissue sheets to Miss Gaar after they had been copied. He advised Fifth Avenue that the list should be returned to AAA when the copying was completed. He further admonished that anyone else who wanted the list had to go to AAA. Fifth Avenue had told Miss Gaar that day that it could get out her literature, possibly on the 10th of August, following the completion of its work for the Haley slate.

Since there was only one list available at AAA, the Davis slate was not only subjected to the foregoing discriminatory treatment but could not get the union to remedy this discrimination. The union had labels available for a post election mailing of the AGVA News in October. AGVA could have given the Davis slate these labels. New labels

could have been secured in time for the October mailing. In addition, AGVA could have had these labels photocopied for the Davis slate. It also had available the membership cards from which the labels and tissue sheets had been copied. Furthermore, it could have remedied this violation of the statute in the same way it could have remedied its failure to comply with candidates' reasonable requests for a compaign mailing. It could have held up the ballots until the list had been given to and utilized by the Davis slate or it could have obtained a delay in the mailing of the Haley literature. The union failed to employ any remedial measure.

No anti-discrimination provision was ever more plainly written into a statute than that here under consideration. The union, by the terms of that provision, is under a clear duty "to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members." The provisions which AGVA made initially for candidates to secure and use the one list which it had furnished AAA were inadequate. It furnished one list to AAA "for election purposes," without further instruction. Consequently, when the Haley slate secured the list after it had been requested by the Davis slate, there was no guide for the union's employees or AAA's employees by which the resulting discrimination could have been either avoided or remedied. The fact that AGVA provided only one list to be used by candidates on a "first-come, first-served basis" is the nub of the discrimination here. If there had been one list for each slate, there would have been no cause for complaint by any candidate under the facts of this case.

Although it is not necessary to resort to the legislative history of a statute when the words are plain, Wirtz v. Local 191, 321 F.2d 445, 448 (2d Cir. 1963), it is, nevertheless, reassuring to know that the framers of a particular statutory provision had in mind precisely the problem to which the provision is now applied.

In the course of the Senate debate on what is now Section 401(c), as amended, Senator McClellan asked Senator Javits, the proponent of the amendment and the provision now under consideration, if the amendment would preserve the right of a candidate to obtain a list. Senator Javits replied:

"In the amendment, I preserve the right that he shall not be discriminated against * * * in other words, if anyone gets the list, he will get the list." [13]

Senator Javits further elucidated the purpose of his amendment:

"Mr. President, to explain the amendment, let me say that it requires that if anyone in a union has the use of lists or the use of mailings or circulars, then, on similar terms and conditions, anyone else who is a bona fide candidate shall have the same use. Such a provision will take care of insurgents, and at the same time it will take care of those who are not candidates, but who simply are trying to obtain a union list.

The amendment will apply equally to an incumbent president of a union who, without regard to what the union's regulations may be, will have the list, as we know, and to anyone else who is a serious candidate for the same office." Leg.Hist. of the LMRDA of 1959 (1959 Ed.), p. 1240, col. 2.

There was no access to and use of AGVA's membership list by the Davis slate on the same terms and conditions applicable to the Haley slate *at the same time* such use and access were afforded the latter slate.

As stated above, Mr. Jones, the then Assistant National Administrative Secretary, secured the list after Miss Gaar had requested it without result. He facilitated the use of the list for the Haley slate by promptly authorizing the insertion of a Variety newspaper reprint in an

13. Legislative History of the LMRDA of 1959 (1959 Ed.), p. 1240, col. 3.

appropriate envelope for mailing to AGVA's membership. Jones officiously prevented any assistance to Miss Gaar in her quest for the list from Fifth Avenue and threatened the company with a law suit. Though under cross examination, Jones denied that he was being partial to the Haley slate, the preceding facts belie this denial. This purposeful discrimination by an AGVA employee cannot be overlooked in assessing the facts for the purpose of determining whether the anti-discrimination provision has been violated.

This violation of section 401(c) is likewise of such a nature as to cause this court to declare void the 1965 election since, again, as the evidence shows, this discrimination resulted in a mailing of the Davis slate literature four days after the ballots were mailed and three days after Haley literature was mailed. By that time a sufficient number of members had voted to create the existence of a "reasonable probability" that this violation of the statute "may have affected the outcome of the election." This court may, therefore, void AGVA's election on this statutory breach.

III. AGVA also violated that provision of section 401(c) which commands it to provide adequate safeguards to insure a fair election. There can be no dispute that the Congress intended, when it adopted section 401(c), to impose upon unions a duty, enforceable by the Federal courts, to conduct democratic and scrupulously fair elections. In the act, itself, there is this statement:

"The Congress finds that, in the public interest, it continues to be the responsibility of the Federal Government to protect employees' rights to * * * choose their own representative * * * " LMRDA, Title IV, Section 2(a) (29 U.S.C. § 401(a)).

This clear national policy was punctuated in the Senate's Report on LMRDA as follows:

"It needs no argument to demonstrate the importance of free and democratic union elections. * * * The Government which gives unions [this] power has an obligation to insure that the officials who wield it are responsive to the desires of the men and women whom they represent. The best assurances which can be given is a legal guaranty of free and periodic elections. * * * Guarantees of fairness will preserve the confidence of the public and the members in the integrity of union elections." Leg.Hist. of LMRDA 1959 (1959 Ed.), p. 416.

Virtually identical language appears in the House Report. Leg.Hist. of LMRDA 1959 (1959 Ed.), p. 773-774.

The sentence of section 401(c) which begins: "Adequate safeguards to insure a fair election shall be provided, * * *" originally read: "Adequate safeguards to insure a fair count of the ballots * * * " [14]

A fair election here depended on the provision of adequate safeguards with respect to candidates' campaign literature distribution by the union and candidates' access to and use of a single membership list. The only information which AAA had was that the list was to be used for "election purposes." As the facts here show, the failure to provide any other instructions (along with subsequent union interference) led to legally signifi-

---

14. Text of Bill as passed by Senate. S. 1555 April 25, 1959. Both House Bills, H.R. 8342 and H.R. 8400 (Landrum-Griffin Bill), used the present language. The Landrum-Griffin Bill, as amended, which contained the language of the present bill, passed the House on August 14, 1959. The Senate Bill (S.1555) was then called up for consideration. The language of the Landrum-Griffin Bill, as amended, was substituted for the Senate Bill and the Bill was passed as S.1555. The meas-ure then went to a conference committee which let stand the language of the Landrum-Griffin Bill without comment. Statement of the Managers On The Part Of The House, Conference Report #1147 on S.1555. Leg.Hist. of LMRDA 1959 (1959 Ed.), p. 934 et seq. See Leg.Hist. of LMRDA (1959 Ed.), p. 1850, col. 1, Sen. Goldwater's remarks analyzing the difference between the Senate and House Bills, and the action of the conferees.

cant discrimination against the Davis slate. The union's inability to fulfill its duty to comply with candidates' reasonable requests to distribute campaign literature was also directly related to the union's failure to provide adequate safeguards regarding this activity. If, as noted above, AGVA had formally adopted AAA's campaign mailing procedure, had advised its employees and the candidates of same, and had furnished instruction as to the use of the list, a violation of AGVA's campaign distribution duty may have been avoided.[15] However, this was not done. Except for the one letter of July 8, 1965 containing Mr. Keenan's brief directive regarding the list, it appears that AGVA provided no adequate safeguards for the conduct of this election.

This violation of section 401(c), like the two previous violations, is of such legal consequence as to cause this court to set aside AGVA's 1965 election.

IV. The final violation of the statute here does not fall into this category. AGVA did violate that provision of section 401(c) which provides as follows:

"Every bona fide candidate shall have the right, once within 30 days prior to an election of a labor organization in which he is a candidate, to inspect a list containing the names and last known addresses of all members of the labor organization who are subject to a collective bargaining agreement requiring membership therein as a condition of employment, which list shall be maintained and kept at the principal office of such labor organization by a designated official thereof." See, 29 C.F.R. 452.9(b) (1965).

This provision placed upon AGVA another clearly defined duty which it ignored. AGVA had the duty to maintain the described membership list at its principal office in the custody of a designated official. No such list was maintained at AGVA's office during the 1965 election as its letter to AAA of July 8, 1965, signed by Mr. Harold Keenan, head of AGVA's national Membership Department, explained. In that letter, Mr. Keenan advised Mrs. Carlson of AAA that the list was to be used "for election purposes and *at the same time* to be used as the candidates inspection list." (Emphasis added). Not only was the list not maintained at AGVA's principal office by a designated official thereof, but while it was at Fifth Avenue at the behest of the Haley slate, it was not available to any other candidate for inspection.

However, no condidate in the challenged election sought mere "inspection" of the list containing almost 14,000 names. Although Miss Gaar did mention to Mr. Keenan that she had a right to inspect the list this was not her real aim. No attempt to disqualify members as ineligible to vote was involved here. There was no charge that names of members in good standing had been omitted from the list. Consequently, a mere inspection of the list does not seem to be genuinely involved, especially since this mere inspection right did not carry with it the right to copy the list.[16] What was sought by Miss Gaar on behalf of the Davis slate was the right to have her literature mailed by the union and failing this, to have the same use of the list granted the Haley slate. In this latter connection, the right to have the list copied by Miss Gaar's mailing house clearly arose.[17] The right to have Fifth Avenue copy the list had been granted the Haley slate. Mere inspection would not have sufficed under the facts of this case.

Moreover, although there was a clear violation of the inspection requirement, the Secretary has failed to show

---

15. The only evidence in the record regarding efforts by the Swann-Valentine slate to secure the list is found in the testimony of Mrs. Carlson who testified that Valentine sought to have the list sent to an unacceptable mailing house.

16. Conference Report #1147 on S.1555. Statement of the Managers On The Part Of The House, p. 7. Leg.Hist. of LMRDA, p. 938, 29 C.F.R. 452.9 (b) (1965).

17. 29 C.F.R. 452.9 (b) (1965).

that this violation of the statute presents a "reasonable probability" that the outcome of the 1965 election may have been affected by such violation. The requirement of the LMDRA, Title IV, § 402(c) (29 U.S.C. § 482(c)) that the proof must show by a preponderance of the evidence that the violation of § 401(c) "may have affected the outcome of the election" cannot be disregarded by this court. "The proviso was intended to free unions from the disruptive effect of a voided election unless there is a meaningful relation between a violation of the Act and results of a particular election." Wirtz v. Local 410, supra, 366 F.2d at 443. This court, consequently, cannot void AGVA's 1965 election on this ground.

V. However, as held above, other violations of section 401(c) are sufficient to void the election. There is in this case a "reasonable probability" that the outcome of the 1965 election may have been affected by these violations. This holding is based upon this court's finding that the violations resulted in a delay in mailing the Davis slate literature until after the ballots had been mailed. These violations also resulted in a delay in mailing the Davis literature until after the Haley literature had been mailed. This court finds that this time gap may have affected the results of the 1965 election.

If only the Haley literature had been mailed before the Davis literature but not the ballots, the relationship between the violations and the probable affect upon the election would not have been readily ascertainable. Consequently, the pivotal fact here is that the ballots had gone out.

The sequence of dates here is crucial: the ballots had gone out on August the 9th, Haley literature on August the 10th, and the Davis literature on August 13. AGVA members had begun to vote and return their ballots to AAA before the Davis literature could possibly have

reached them. Enough members had done so to have had a probable effect upon the outcome of the election.

The record discloses that AAA received 11 ballots on Wednesday, August 11; 99 ballots on Thursday, August 12; and 362 ballots on Friday, August 13. Thus, 472 ballots were mailed before the Davis literature was mailed. No ballots were delivered on Saturday, August 14 and Sunday, August 15. On Monday, August 16, 533 ballots were delivered. Since the ballots were returned by ordinary mail and there was no delivery on Saturday or Sunday, Monday's returns must have included many ballots marked and mailed before the voters received the Davis literature. Indeed, since the great majority, if not all of the voters, received the Davis literature on Monday, August 16 or after, ballots received on Tuesday, August 17 (296), and Wednesday, August 18, (207) may have been cast before the Davis literature was received.

The results of the voting were as follows: [18]

1) The Haley candidates won all six races for National Officers by margins which ranged from 89 votes (Recording Secretary) to 529 votes (Treasurer). The margin in the race for President was 473 votes.

2) In the nine races for National Board members from specified Branches, one victor was unopposed (Kathy Kohls, Denver); three victors were endorsed by both slates (Lester Lake, Cincinnati; Violet Murray, Toronto; and Steve Allison, Washington, D. C.); one candidate of the Davis slate won election (Frank Cook, Sarasota-Tampa); and four candidates of the Davis slate were defeated by Haley slate candidates by margins which ranged from 219 votes (Boston Branch) to 769 votes (New Orleans Branch).

3) One of the five posts for National Board Members At Large went to Margie

18. The results are shown in the AAA certificate [Exh. 18] and in the September-October AGVA News, p. 2 [Exh. 15]. The Haley slate is listed on Exhibit 27-A. The Davis slate is listed on Exhibits 19-E, 19-J, and 19-K. The only evidence in the record as to the fate of the third slate is that Swann was elected Treasurer. However, he was endorsed by the Haley slate.

Coate of the Davis slate (1187 votes). Four posts went to the Haley slate: Karl Wallenda (1237 votes), Billy Grant (873 votes), Ted Blake (866 votes) and Matt Kind (864 votes). The losing candidates of the Davis slate were Eddie Barton (762 votes), Harry "Lefty" Lewis (741 votes), Sally Moore De May (623 votes) and Frances Gaar (517 votes). For these candidates, the margin of loss ranged from 102 votes (Barton) to 347 votes (Gaar).

Thus, it has been demonstrated that the 472 ballots received before the Davis literature was mailed greatly exceeded one-half of the margin by which any of the Haley candidates defeated a Davis candidate. This has been demonstrated without including any of the 533 ballots received on Monday, August 16.

Defendant contended that no relation between the alleged violations and the results could be claimed by the Secretary since the Davis slate is responsible for the failure of its literature to go out on August 12. Defendant asked this court to find that the Davis slate held up its own mailing until August 13 to insert a Variety reprint. Miss Gaar testified that her slate was advised by Midtown that its mailing would not be ready until August 13, and this target date would not be upset if the reprint were inserted. The first insertion had not been reproduced by the Davis slate until August 11, after it was certain there would be envelopes for a mailing. An aide at Midtown testified that it was his recollection that the mailing could have gone out on the 12th, but was held up a day for the Variety reprint. The record, consequently, does not resolve the question in favor of either party. Miss Gaar's reliance on her understanding of the mailing date should not defeat the Secretary's case. The facts do not warrant that result.

Even if the literature had been mailed on Thursday, August 12th, it could not have reached any members until Friday, August 13th at the earliest, and by that time 472 ballots had been received and many more were in the mail. This was a national election with most voters at a two-day mailing distance from New York. Therefore, few, if any, of the first 1005 ballots [those received through Monday, August 16th] would have been mailed after the voters had read the Davis campaign literature, even if the literature had gone out on Thursday, August 12th.

This court finds from the foregoing facts, established by a preponderance of the evidence, that there is a "reasonable probability" that the statutory violations which occurred here " 'may have affected the outcome' of the election". Wirtz v. Local 410, supra 366 F.2d at p. 443.

AGVA's 1965 election of officers and board members is, therefore, declared void. The Secretary of Labor is directed to conduct a new election under his supervision and, "so far as lawful and practicable, in conformity with" AGVA's Constitution and By-Laws. LMRDA, Title IV, § 402(c) (29 U.S.C. § 482(c)). The Secretary shall promptly certify to this court the names of the persons elected. This court will then enter an order declaring such persons elected.