Lloyd SHELDON et al., Plaintiffs,

v.

Thomas F. O'CALLAGHAN, as International President, etc., of International Organization of Masters, Mates and Pilots, AFL–CIO

and

Donald B. Straus, as President, etc., of American Arbitration Association, Defendants.

No. 71–Civ. 4113.

United States District Court, S. D. New York.

Oct. 18, 1971.

Burton H. Hall, New York City, for plaintiffs.

Marvin Schwartz, New York City, for defendant International Organization of Masters, Mates and Pilots, AFL–CIO.

CROAKE, District Judge.

## MEMORANDUM

This action is concerned with the pending election of officers of the International Organization of Masters, Mates and Pilots, AFL–CIO ("IOMM&P"). The motion relates to Section 481(c) of the Labor-Management Reporting and Disclosure Act of 1959. 29 U.S.C. § 481(c) ("LMRDA") seeking relief from alleged improper Union election procedures.

Plaintiffs are candidates for office in the Union. They contend that the defendants, officers and candidates to succeed themselves, have distributed campaign literature, at the expense of the IOMM&P, which is discriminatory. They allege they have been denied proper access to the use of membership lists. They seek to have defendants restrained from mailing the relevant ballots until such time as they also are provided distribution similar to that allegedly provided to the defendants. They also seek a direction that defendants make available to candidates for office in former Local 88 certified copies of the mailing lists of members thereof. Plaintiffs submitted two pamphlets distributed by IOMM&P which allegedly violate § 481(c): one, an eight-page newsletter entitled "60th Convention Newsletter of the Resolution of Affiliation of the IOMM&P with the ILA ("Newsletter"); the other, a forty-eight page magazine entitled, "Master, Mate & Pilot, August 1971, vol. 1, No. 2 ("MM&P Magazine").

The Newsletter, according to defendants, was mailed August 19, 1971 in connection with a merger referendum ballot mailed August 20, 1971. Defendants contend that the Newsletter was distributed solely in connection with the referendum ballot of IOMM&P–ILA proposed merger, independent of the upcoming election. Plaintiffs urge that, though purporting to discuss the merits of merging IOMM&P with the International Longshoremen's Association ("ILA") through news articles and speech excerpts, in fact, the Newsletter serves as a conduit for campaign oratory in favor of the incumbent president,[1] defendant O'Callaghan, who is in favor of the affiliation, while vilifying the opposition,[2] including plaintiff Sheldon, only dissenting delegate on the question

---

1. For example, the "Newsletter" notes an executive vice-president of the ILA as saying "I trust "O'Callaghan, and if O'Callaghan wasn't the top man here I'd think twice before saying I want the affiliation to go through with the Masters, Mates and Pilots." " . . . O'Callaghan I trust." ("Newsletter," p. 5.)

   In addition, Congressman Edward A. Garmatz, Chairman, House Merchant Marine and Fisheries Committee, is quoted as saying, "I commend the foresight and the courage of my two long-standing friends, Tommy O'Callaghan and Teddy Gleason, President of the ILA. It takes courage to make a major step such as this AFFILIATION. And their action renews my conviction that they are both dynamic leaders.

   "I think the maritime industry of the future will require such leadership. It will need more men like these two, men who have the forceful determination to break precedent, to hurdle obstacles, and to blaze fresh, forward-moving trails." ("Newsletter," p. 2.)

2. For example, note the following: Teddy Gleason, International ILA President and Vice-President of the AFL–CIO executive council is quoted as saying, "When they (referring to IOMM&P 'opposition' leaflets in his possession) bring up such questions as racism in connection with the AFFILIATION it turns my stomach . . . and when I see a man who was once head of the IOMM&P for years hooking up with this propaganda . . . for personal

of affiliation at the July 1971 IOMM&P convention and former IOMM&P president.

■ The LMRDA recognizes a public interest in allowing unions "great latitude in resolving their own internal controversies . . ." *Calhoon v. Harvey,* 379 U.S. 134, 140, 85 S.Ct. 292, 296, 13 L.Ed.2d 190 (1964). At the same time Congress adopted § 481(c) [3] to maintain democratic and fair conduct in election of union officials, enforceable by the federal courts. *Backo v. Local* 281, United Brothers of Carpenters & Joiners of America, 308 F.Supp. 172 (N.D.N.Y.1969); Wirtz v. American Guild of Variety Artists, 267 F.Supp. 527 (S.D.N.Y.1967); Summers, "Judicial Regulation of Union Elections," 70 Yale L.J. 1221, 1227, 1254 (1961).

■ The court finds that the "Newsletter," containing electioneering for the incumbent candidate, *ad-hominem,* attacks upon an opposition candidate, coupled with the timing of the distribution, constitute campaign literature for de-

---

gain, and nothing else; this from a man who has been around this industry and labor for more than 15 years . . . doing this for the sake of job . . . it makes me sick again.

"I believe in a guy fighting like hell within his union, within his union [sic]. I believe in labor democracy, union democracy. But I *don't believe in anybody taking money from somebody else to put out propaganda trash like this stuff.* (Italics in original.)

"We have copies of the paid bills, paid from outside sources, for printing of the anti-IOMM&P–ILA propaganda. We know where this trash was printed, who paid and when. And I tell you, if anyone in the IOMM&P took outside money to print this material trying to bring about disruption within your own organization, then it's wrong, very wrong.

"I think you all know me. If anyone wants to get up and say his piece, I admire him for doing that. But I don't think anyone, including me, should *go outside of our ranks to hurt our own organization. No union man should do it,* no one else in *other organizations should go outside of his ranks.* He should fight like hell within his own ranks to make the changes he wants. (Italics in original.)" ("Newsletter," p. 3.)

"A "Newsletter" article headed "A VOICE OF THE OUTSIDER, AND INSIDE MOUTHPIECES," states:

"There is not the slightest doubt that Mr. Calhoun [NMEBA leader opposed to IOMM&P–ILA merger] is keeping his word, he is speaking out in leaflets, pamphlets, and subversion—through his flunkies, character assassins, racists, and finks who pollute the waterfront with propaganda against the leadership of the IOMM&P, and the ILA, with mindless, poisonpen, libelous anti-labor trash. They are speaking out in his words, parroting his exact phrases and ideas. Groups, and cliques who spread the garbage suck the curdled milk from the mother wolf who inspires the wolfpack.

A "Newsletter" article entitled, "PRESIDENT O'CALLAGHAN RESPONDS TO A CONVENTION DELEGATE," states, "The lunatic fringe are working all angles, racism, red herrings, bigotry and slander. That's the kind of thing and the people that we are dealing with." ("Newsletter," p. 6.)

3. Section 481(c) states, in part: "Every national or international labor organization, except a federation of national or international labor organizations, and every local labor organization, and its officers, shall be under a duty, enforceable at the suit of any bona fide candidate for office in such labor organization in the district court of the United States in which such labor organization maintains its principal office, to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members, and whenever such labor organizations or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution." 29 U.S.C. 481(c).

fendant—O'Callaghan distributed at the expense of defendant labor organization. Plaintiffs are entitled to the opportunity to have campaign literature distributed in a similar manner and with equal force as that of the defendants. The distribution "shall be made by [defendant] labor organization and its officers, with equal treatment as to the expense of such distribution." LMRDA § 481(c).

Yablonski v. United Mine Workers, 305 F.Supp. 868, (D.D.C.1969) deals with what may be improper in electioneering of officers in a labor union. In *Yablonski, supra,* plaintiffs sought to have the court provide for a column in the Union's journal be set aside for the use of the plaintiff. *Yablonski* also sought to have final proof of each forthcoming edition of the journal at least 72 hours prior to printing. Both acts were sought to "neutralize" the compaign literature of defendant-incumbent found to have been circulated within the journal. The court, in *Yablonski,* did not grant the relief requested, noting the right of freedom of the press as guaranteed by the First Amendment. In addition, the court found no authority within Section 481(c), nor Section 481(g).[4] In granting "equal treatment" in this application, we are not faced with the difficulties noted in *Yablonski, supra.* The relief here sought relates to the right of distribution and the right to expenses expressly provided for in the LMRDA rather than to a remedy involving editorial control and direct economic support other than as specified by statute.

■ Unlike the finding in regard to the Newsletter, we do not view the "Master, Mate & Pilot" magazine, in tone or content, as campaign literature. The magazine, discussing IOMM&P's "functions, policies and activities," displays O'Callaghan and other incumbent candidates in their respective representative capacities as active participants in matters of interest to the membership. It does not discuss members who are not active participants who are candidates for office. It is not unusual for the publication to publish pictures of incumbent officers in the performance of their related activities. This is not "excessive coverage, column-wise and pictorially, given to defendant . . . in relation to the coverage of other matters contained" in the MM&P magazine. Yablonski v. United Mine Workers, 305 F. Supp. 868, 871 (D.D.C.1969). See also Hodgson v. Liquor Salesmen's Union, Local 2, 78 LRRM 2021 (S.D.N.Y.1971); Cox, "Internal Affairs of Labor Unions Under the Labor Reform Act of 1959," 58 Mich.L.Rev. 819, 844 (1960).

■■ In addition to seeking distribution of their material, plaintiffs seek to restrain the mailing of the proposed ballots to insure that the plaintiffs' material will be received in advance of the ballots. A preliminary injunction is an extraordinary remedy granted, in the court's discretion, upon a clear demonstration of both probable success and irreparable injury. Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2d Cir. 1969), National Association of Letter Carriers, AFL–CIO v. Sombrotto, 449 F.2d 915 (2d Cir. 1971), see 7 Moore Federal Practice, ¶ 65.04 at 1625 (2d ed. 1966). The LMRDA provides for post-election remedies, so as to prevent blocking or delaying of Union elections while affording adequate relief through enforcement by the Secretary of Labor if "upon a preponderance of the evidence after a trial upon the merits, the court finds . . . (2) that the violation of section 481 of this title may have affected the outcome of an election."

---

4. Section 481(g) states: "No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this subchapter. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election." 29 U.S.C. § 481(g).

LMRDA § 482(c). "[T]he intent of Congress in establishing . . . post-election remedies was to allow the labor organization full scope to review its own election after it had taken place, and after many pre-election grievances had resolved themselves by the results of the election." Wirtz v. H. H. Buy Lodge, No. 872, Brothers of Railroad Trainmen, 279 F.Supp. 873, 874 (W. D.Pa.1967). The plaintiffs have not met their burden of showing irreparable injury in light of the enforcement procedures within § 482 LMRDA and based upon the information submitted. Accordingly, a preliminary injunction is denied.

The plaintiffs also seek a direction that defendants make available to candidates for office in the former local 88 certified copies of the mailing list of members. According to the complaint, Article five, Section five, of the by-laws of the former Local 88 provide that: "A certified mailing list of all members of Local 88 shall be made available at cost to all candidates, provided, however, that any postage charges shall not be billed to this Organization." Plaintiffs allege that former Local 88, recently merged into the Offshore Division of IOMM&P, retained the right to govern the election of local officers, but that it is being prevented from doing so by the conduct of the defendants who have so far refused plaintiff Soto's requests for the mailing list.

The facts, as presented by plaintiffs and not disputed by defendants, display a violation of the spirit of LMRDA as well as the letter of that law. The LMRDA endeavors to preserve the integrity of the election process as it is the core of Union democracy. Section 481(e) LMRDA provides: "The election shall be conducted in accordance with the constitution and by-laws of such organization insofar as they are not inconsistent with the provisions of this subchapter." It appears there is "discrimination . . . against . . . [a] candidate with respect to the use of lists of members." Section 481(c) LMRDA. Defendants are directed, therefore, to make the mailing lists available to candidates for election to office in former Local 88.

A preliminary injunction is denied. Plaintiffs are entitled to relief because of violation of the LMRDA § 481(c) by the defendants as it relates to campaign literature and mailing lists.

In accordance with the foregoing, plaintiffs will submit order on notice.