James **BALANOFF**, Plaintiff,

v.

Raymond J. **DONOVAN**, Secretary of Labor, Defendant.

No. 82 C 2466.

United States District Court, N.D. Illinois, E.D.

June 23, 1983.

Leon M. Despres, Thomas Geoghegan, Despres, Schwartz & Geoghegan, Chicago, Ill., for plaintiff.

Edward J. Moran, Asst. U.S. Atty., Chicago, Ill., for defendant.

Michael Gottesman, David M. Silberman, Bredhoff & Kaiser, Washington, D.C., for United Steelworkers of America.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

For yet a third time this court must assess the rationality of the Secretary of Labor's refusal to institute suit at the behest of plaintiff James Balanoff. As set out in the court's previous opinions, Balanoff petitioned the Secretary to sue District 31 of the United Steelworkers of America (USWA) for an order overturning the results of an election held on May 31, 1981 for the post of District Director. Balanoff, the incumbent, lost the election to Jack Parton. At the time of the balloting, Parton was President of Local 1014, a sub-unit within the jurisdiction of District 31. *See Balanoff v. Donovan,* 549 F.Supp. 102 (N.D.Ill.

1982) (hereafter *"Balanoff I"*); *Balanoff v. Donovan,* 569 F.Supp. 962, No. 82 C 2466 (N.D.Ill. February 18, 1983) (hereafter *"Balanoff II"*).

■ A brief review of this litigation will highlight the issues still to be resolved.[1] Under federal labor law, only the Secretary of Labor may file a complaint to set aside a union election. Balanoff requested that the Secretary take such action, and submitted several petitions in which he alleged that numerous irregularities had tainted the 1981 election. The Secretary disagreed, and issued a Statement of Reasons explaining why litigation against the union was not, in his view, warranted. Balanoff then sued the Secretary, alleging that the Secretary's reasoning was arbitrary and capricious. *See Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975) (authorizing judicial review of such claims). Cross-motions for summary judgment were filed limited to a discussion of only two of Balanoff's underlying arguments, those deemed most meritorious by plaintiff. (Plaintiff has since informed the court by letter that he will not proceed further on his remaining claims, but will instead stand on his two most promising claims).

Balanoff's two claims deal with an alleged misuse of *Steelabor* (the official journal of the USWA) and with an alleged extortion of contributions to the Parton campaign. The *Steelabor* charge is two-sided; Balanoff asserts that the editors of *Steelabor* ran several articles on the opening of a union hall in Parton's local solely to afford Parton favorable publicity; plaintiff further claims that he himself received no coverage whatsoever during the campaign of his non-partisan, union activities. (The latter claim is referred to in this opinion as the "blackout" claim.)

The court held in its initial opinion that the Secretary had properly rejected the ex-

---

1. At the outset, the court grants the USWA's motion to intervene as a party-defendant. The USWA is clearly entitled to participate in this action as a matter of discretion, Fed.R.Civ.P. 24(b), if not as a matter of right. Fed.R.Civ.P.

tortion claim,[2] but that he had failed to make any findings or conclusions with respect to the "blackout" charge. The case was thus remanded to the Secretary to remedy his failure to act. The court deferred passing on the Secretary's handling of the remaining *Steelabor* allegation.

The Secretary filed a Supplemental Statement of Reasons addressing the

24(a). Plaintiff's motion to strike the submissions of the USWA is accordingly denied.

**2.** As explained in *Balanoff I,* the Secretary was willing to assume that Chicago-area contributions had been extorted by agents of the "McBride Team," a political organization opposed to Balanoff. The Secretary nevertheless decided that these acts had not affected the District 31 race because "[a] review of the Parton financial records disclosed no money contributed from McBride or the McBride Team." In other words, the Secretary inferred from his review of the Parton records that the tainted money had not reentered District 31. Plaintiff objected to the Secretary's reasoning because, *inter alia,* the Parton records "were not maintained or kept under any legal requirement." Plaintiff further complained that the Secretary had failed to subpoena the McBride Team's bank records pursuant to 29 U.S.C. § 521(b). The court weighed these attacks, but could not agree they had so undermined the probative force of the Parton records that it was possible to say the Secretary had reasoned irrationally.

Plaintiff has since sought, through discovery, to investigate the Parton bank records himself. The Secretary has responded with a motion for a protective order, and the court now grants this motion. In *Balanoff I,* the court asserted that in passing upon the rationality of the Secretary's reasoning, it could, consistently with *Bachowski,* take note of considerations not explicitly mentioned in the Statement of Reasons to the extent those considerations aided "the court in ascribing the appropriate weight to the facts cited by the Secretary." 549 F.Supp. at 107. The court thought it to be within its power to consider, for example, that the Parton records were not "maintained ... under any legal requirement," and that they could not in any event reflect indirect payments by the McBride Team (*e.g.,* to Parton's listed contributors or to Parton's creditors). But while the court was willing to let Balanoff challenge the Secretary's logic in this abstract fashion, it was not willing to let him present an affirmative case of his own through additional evidence of what had actually occurred. *Id.* at 107 n. 10. Under *Bachowski,* the court's inquiry turns solely on the significance of the facts deemed "essential" *by the Secretary;* a plaintiff such as

"blackout" charge. The Secretary concluded that the allegation was not a proper basis for suit because Balanoff had not raised it while exhausting internal union appeals, and because the claim failed on the merits. The court found neither conclusion rational or defensible in light of the facts cited by the Secretary, and remanded the case a second time for further action.[3]

Balanoff is not entitled to a hearing in which he can introduce wholly new "essential" facts of a historical nature. 421 U.S. at 573, 577, 95 S.Ct. at 1860, 1863. Yet that is precisely what Balanoff will seek, should discovery confirm his theory of how the McBride Team's funds actually were spent prior to the election.

Stated somewhat differently, the court held in *Balanoff I* that the Secretary's refusal to look beyond the Parton records was not irrational in light of the possibility that an extended investigation might have disclosed contrary data. Actual discovery of such information does not retroactively alter that perspective, the only one that is relevant.

**3.** Though the rationality of the Secretary's reasoning on the merits of the "blackout" claim is no longer at issue, the court wishes to clarify its previous holding—particularly since footnote six of the USWA's opening brief appears to contain a tactful request to reconsider. All that the court held in its last opinion was that the Secretary's evidence "does not adequately support the conclusion that Balanoff received fair coverage during the campaign of his union-related, non-partisan activities." *Balanoff II,* at 965. The court simply rejected the assertion in the Supplemental Statement of Reasons that Balanoff had actually received the coverage he was legally due during the election season. The USWA asserts in response that "the Secretary's evidence establishes that during January-April, 1981 *Steelabor* blacked out *both* candidates." (footnote six) (emphasis in original) But this very claim concedes, as the court held, that the Secretary had not disproven the existence of "blackout"-directed towards Balanoff. The USWA's argument really goes to whether the .conceded "blackout" adds anything to the analysis of whether, under *all* the circumstances, *Steelabor* was used in an improper manner. *See generally Balanoff I,* 549 F.Supp. at 105 n. 5; *Balanoff II,* at 965 n. 4. The court expressed no opinion on this subordinate question because it did not believe the Secretary had reached it. The court read the Supplemental Statement of Reasons to contain a legal conclusion that no "blackout" had occurred, not that one had occurred but was insignificant.

The Secretary responded with the Second Supplemental Statement of Reasons now before the court. In this document, the Secretary marshals further evidence in support of his argument that Balanoff failed to exhaust the "blackout" charge. The court must therefore reconsider the rationality of this argument in light of the enhanced factual record the Secretary has presented. The court's ultimate conclusion will be that the Secretary's position now appears rational. The court will then examine the Secretary's rejection of plaintiff's remaining allegation that the union hall articles found in *Steelabor* were improper. Once again, the Secretary will be upheld.

I. *Exhaustion of the "Blackout" Claim*

█ The Secretary of Labor may institute suit to overturn a union election only if petitioned to bring such an action by a member of the affected union. The member must in turn have "(1) . . . exhausted the remedies available under the constitution and bylaws of such organization and of any parent body, or (2) [have] . . . invoked such available remedies without obtaining a final decision within three calendar months after their invocation." 29 U.S.C. § 482(a).

█ The relevant chronology is as follows. Soon after the May 28, 1981 election, Balanoff filed a written protest with the appropriate USWA authorities. A hearing on these charges was held on July 31, 1981 before the International Tellers of the USWA. After the Tellers rejected plaintiff's claims, an appeal was taken to the International Executive Board of the USWA. The Board heard Balanoff on August 31, 1981 and affirmed the Tellers' decision the same day.

Balanoff concedes that *no* allegations pertaining to *Steelabor* were raised prior to the August 31 hearing. The Secretary, in his Supplemental Statement of Reasons, further found that the "blackout" claim was not mentioned even at that late date. Citing the reports of several interviews his staff had conducted during the Department of Labor's initial investigation of Balanoff's charges, the Secretary concluded that Balanoff had at most complained about the un-

ion hall articles during the August 31 hearing. For the reasons set out in *Balanoff II,* this court could not agree that the scraps of information contained in the interview reports provided a rational basis for the inference drawn by the Secretary. The court's remand order, however, expressly authorized the Secretary to "investigate the circumstances of the August 31 hearing further in order to find evidence supporting his position." *Balanoff II,* at 968 n. 3. The Secretary followed this suggestion, and obtained a transcript of the August 31 hearing. He now claims that the transcript provides indisputable evidence that plaintiff failed to exhaust his claim.

█ Plaintiff concedes, though grudgingly, that the court must hereafter assume that the transcript accurately reveals all pertinent statements made on August 31. Plaintiff nevertheless argues that the Secretary's legal assessment of the significance of those statements is indefensible, for the transcript proves that Balanoff raised his "blackout" claim with sufficient clarity. Plaintiff grounds his entire attack on the fact that he uttered the following statement before the Board: "And we're charging that, the use of Steelabor to help the campaign of Jack Parton." (Transcript of August 31 hearing at 143–44) Balanoff urges two reasons why this statement must be deemed sufficient. First, governing precedent teaches that the exhaustion requirement may not be applied in a strict or technical manner. "[B]road or imprecise language" is sufficient so long as it reveals to the union "in some discernible fashion" the nature of the complainant's charge. *Hodgson v. Local Union 6799, United Steelworkers of America,* 403 U.S. 333, 340, 341, 91 S.Ct. 1841, 1846, 1847, 29 L.Ed.2d 510 (1971). There is "a heavy burden [placed] on the union to show that it could not in any way discern that a member was complaining of the violation in question." *Id.* at 341, 91 S.Ct. at 1846; *accord, Wirtz v. Local Union No. 125, Laborers' International Union of North America,* 389 U.S. 477, 88 S.Ct. 639, 19 L.Ed.2d 716 (1968) (exhaustion satisfied so long as union afforded "fair

opportunity to consider and redress" the asserted violation). As Judge Will of this Court has summarized:

[I]f the member presented an inartfully drawn protest to the union which can be said to cover several violations, the Secretary may litigate other claims arguably covered by the protest when the union can be charged with knowledge thereof under the heavy duty placed upon it by Local 6799 to discern all various violations that a member might be asserting.

*Hodgson v. Local 734, International Brotherhood of Teamsters*, 336 F.Supp. 1243, 1248 (N.D.Ill.1972). Under these decisions, Balanoff concludes, his statement passed "with flying colors."

Second, plaintiff argues that a good faith examination of his August 31 accusation necessarily required an examination of his own treatment in the *Steelabor;* if the Board had truly wished to rule in an intelligent fashion upon the claim that Parton had received "excessive" coverage in *Steelabor,* it first needed to know how the paper had treated *both* individuals. *Cf. Donovan v. Local Union No. 120*, 683 F.2d 1095, 1101 (7th Cir.1982) (court considers claim exhausted, though not explicitly raised, because union must have considered its substance while ruling on a second claim that was concededly raised).

Neither of these arguments prove that the Secretary acted irrationally in concluding that the "blackout" claim had not been exhausted. To begin with, Balanoff's language, when read in context, is nowhere near as "broad" as he claims. His full statement was as follows:

Steelabor ran an article on the opening of the building at Jack Parton's Local Union. They had Lloyd McBride [International President of the USWA] and other people in there for the dedication and ran

an article. They had a whole half a page in Steelabor. But then they followed up the following month again with another article of pictures and everything else. We spent quite a bit of time this morning on just that. And we're charging that, the use of Steelabor to help the campaign of Jack Parton.

(Transcript of August 31 hearing at 143–44) The transcript of the August 31 hearing contains three other scattered references to *Steelabor.* Two of them, like the passage just quoted, repeat the charges levied against the union hall articles. (*Id.* at 151, 161) In the final statement, Balanoff inquires whether the Board members had copies of "that," presumably the *Steelabor* issues containing the disputed articles. (*Id.* at 174)

Balanoff's remarks thus affirmatively directed the Board's attention to the union hall articles. Balanoff did not raise a general claim, but rather a focused attack on particular issues of *Steelabor.* The Secretary rationally concluded that these remarks failed to provide the Board with "fair notice" that Balanoff was also dissatisfied with *his own* lack of coverage in *subsequent* issues of the paper.

At the very least, the Secretary was not obligated to accept Balanoff's secondary argument that the Board members "must have" *in fact* considered the "blackout" issue when passing on Balanoff's accusation. For the reasons just given, the Secretary rationally refused to construe Balanoff's comments as anything approaching a general attack on Parton's assertedly "excessive" coverage. Balanoff's complaint was appropriately viewed by the Secretary as limited to the union hall articles, and a determination of whether *they alone* violated federal law [4] "required only an analysis of the par-

---

4. Balanoff alternatively argues that notwithstanding the dictates of federal law, an internal USWA regulation obligated the Board to take note of *Steelabor's* failure to afford him coverage. Under the pertinent rule, "A union newspaper should not, in advance of an election ... carry a substantial number of articles and pictures featuring persons who happen to be candidates, unless all candidates for the same posi-

tion or positions are given *equal* treatment, *equal* space and *equal* prominence." (emphasis supplied) But under the plain terms of this rule, one need reach a comparative consideration of coverage only if it is first determined that one candidate has appeared in "a substantial number of articles and pictures" prior to the election. The Board members obviously did not think this predicate had been estab-

ticular articles plaintiff challenged in order to determine whether their tone, timing and substance rendered them improper." (Response of USWA to Plaintiff's Reply to Defendant's Second Supplemental Statement of Reasons at 5) Balanoff is merely speculating that the Board members understood his accusation in the alternative way he now phrases it. Such speculation does not prove that the Secretary acted irrationally in reaching an ultimate conclusion inconsistent with this possibility.

In many ways, the dispute between the parties turns on a more basic difference in perception. In essence, Balanoff believes that all of his *Steelabor* claims comprise but one "claim," and that since the Secretary could sue on the allegations underlying a portion of this unitary "claim" (*i.e.,* the allegations concerning the union hall articles), the Secretary could also, during the course of litigation, flesh out the "claim" with the remaining "evidence" of the "blackout." *Cf. Marshall v. Laborers', Local 135,* 106 L.R.R.M. 2500, 2509 (E.D.Pa. 1980) (In a suit brought to overturn an election based on an exhausted claim that the losing candidates had been denied their statutory right to have observers monitor voting and ballot counting, the Secretary was entitled to prove that the violation probably affected the outcome of the election with evidence of ballot tampering, though tampering had not been explicitly raised before the union.); *see also Hodgson v. Local 734, International Brotherhood of Teamsters, supra,* 336 F.Supp. at 1255. The Secretary, on the other hand, appears to take the position that the "blackout" "claim" is so distinct from Balanoff's separate "claim" based on the union hall articles that the former may not "piggyback" on the latter, but must instead stand alone. The court has previously indicated its preference for the former approach, *see* note 3, *supra,* but it cannot say that the Secretary's contrary view is irrational. First of all, a determination by the Secretary that two "claims" rather than one are present reflects an exercise of discretion that the court should not lightly overrule. Moreover, by the time the two Supplemental Statement of Reasons were issued, the Secretary had already ruled that the allegations based on the union hall articles did not warrant litigation. Thus, even if one accepts the unitary "claim" theory, the Secretary can be faulted solely for not reviving the union hall charges as a mere vehicle for injecting different issues into a putative lawsuit. Such a "failure" is not unlawful.

Plaintiff simply fails to appreciate the significance of the procedural posture in which this case arises. Were the court now hearing an action by the Secretary seeking an overturn of the District 31 election, it might well agree with Balanoff that his claim had been raised before the union with sufficient clarity to permit a judicial hearing on the presence of the "blackout." But that possibility is entirely irrelevant. This case turns on a much more limited question—whether the Secretary's contrary determination "is so irrational as to constitute the decision arbitrary and capricious." *Dunlop v. Bachowski,* 421 U.S. 560, 572–73, 95 S.Ct. 1851, 1860–61, 44 L.Ed.2d 377 (1975). For the reasons given, the latter question must be answered in the negative.[5]

lished, and the existence of the union's rule therefore does not undercut the rationality of the Secretary's ultimate conclusion.

5. The court sees no merit whatsoever to Balanoff's half-hearted assertion that the court need not be constrained by the "arbitrary and capricious" standard of review when judging the manner in which the Secretary has applied a mere "house-keeping" rule such as the exhaustion requirement. No decision, to this court's knowledge, has ever endorsed such an argument. Indeed, several courts have expressly utilized the "arbitrary and capricious" standard when testing a finding by the Secretary that a claim had not been properly exhausted. *See, e.g., Fay v. Marshall,* 106 L.R.R.M. 2047 (D.Nev.1980); *Hall v. Marshall,* 476 F.Supp. 262 (E.D.Pa.1979), *aff'd mem.,* 622 F.2d 578 (3d Cir.1980); *Fletcher v. Dunlop,* 91 L.R.R.M. 2113 (N.D.Ill.1975). Moreover, even if there were merit to the proposed distinction between "house-keeping" and "important" rules, it would not lead to the result plaintiff seeks. Contrary to Balanoff's contention, the exhaustion requirement serves important substantive interests; it "preserve[s] the vitality of internal union mechanisms for resolving election disputes." *Hodgson v. Local Union 6799, United*

## II. The Merits of the Remaining Steelabor Claim

■ In his initial Statement of Reasons, the Secretary ruled that the union hall articles appearing in *Steelabor* were not improper:

The complainant alleged that the International used the November 1980 and December 1980 issues of *Steelabor,* the International union newspaper, to create name recognition and to campaign for Parton. The LMSA [Labor-Management Services Administration] investigation established that the two issues of *Steelabor* ran stories regarding the dedication of the new union hall of Local 1014 of which Parton was the President. The November issue reported that the union hall cost $2,000,000, was named the "Lloyd McBride Hall" and was the largest union building ever constructed by a USWA local. The December issue, which was not distributed nationally to all USWA members, but was only included in the Midwest edition of *Steelabor,* described the dedication ceremonies and featured USWA President Lloyd McBride's attendance at those ceremonies. . . .

[T]he Secretary of Labor has determined that the two *Steelabor* articles did not promote Parton's candidacy and did not constitute violations of Section 401(g) of the LMRDA. The building itself and the dedication ceremony were newsworthy stories to the general USWA members and of particular interest to those in District 31, within the Midwest Region. Further, testament to their newsworthiness is that three public newspapers also gave extensive coverage of the building and dedication beginning as early as August 1980. Moreover, the articles are remote in time from the actual election as they appeared six months prior to it. The two issues cover ceremonies at the building dedication and no campaign issues were discussed. In the November issue Parton is quoted three times: one describes the significance of the building, the next explains why it was named for McBride and the third explains how the building will be used. The only picture of Parton featured in that issue is with the other members of the building committee. In the December issue Parton's name is cited three times: one states that he is the President of Local 1014 and notes that he was present at the ceremonies, the second states that he spoke at the ceremony and outlined the local's history, and the last is in reference to the fact that he introduced McBride at the ceremonies. · As Parton was the President of the Local which built the hall, the above-mentioned references to him are appropriate.

Based on all the circumstances of this case, the *Steelabor* articles do not constitute expenditures of USWA funds to promote Parton's candidacy and are not violations of section 401(g) of the LMRDA.

In sum, the Secretary relied upon the subject, tone, and timing of the articles in deciding not to sue. The articles addressed a "newsworthy" topic, reported Parton's role dispassionately, and appeared long before the balloting.[6]

Balanoff finds this reasoning extremely unpersuasive. The court does not. To the extent Balanoff contends that the factors relied upon by the Secretary are irrelevant in *all* cases, plaintiff is clearly wrong. A careful review of the law surrounding union newspapers indicates that each of these factors is an important consideration that must be taken into account. Thus, if a candidate is mentioned in a story dealing with issues of legitimate news interest, courts often find no violation. *See Camarata v. International Broth. of Teamsters,* 478 F.Supp. 321, 330 (D.D.C.1979); *Murphy v. Operating Engineers, Local 18,* 99 L.R.R.M. 2074, 2122

*Steelworkers of America, supra,* 403 U.S. at 340, 91 S.Ct. at 1846.

**6.** In his complaint and briefs filed with this court, Balanoff mentions a third *Steelabor* article concerning the Local 1014 union hall. This article appeared in the September 1980 edition of the paper, but was not mentioned in Balanoff's complaint to the Secretary. The Secretary accordingly did not err by limiting his inquiry to the November and December stories.

(N.D.Ohio 1978); *New Watch-Dog Com. v. New York City Taxi Drivers U.,* 438 F.Supp. 1242, 1250–51 (S.D.N.Y.1977); *Sheldon v. O'Callaghan,* 335 F.Supp. 325, 328 (S.D.N.Y.1971), *affirmed sub nom. Usery v. Intern. Organization of Masters,* 538 F.2d 946 (2 Cir.1976); *Yablonski v. United Mine Workers of America,* 307 F.Supp. 1226, 1227 (D.D.C.1969); *Yablonski v. United Mine Workers of America,* 305 F.Supp. 868, 871 (D.D.C.1969) (dictum). Similarly, if the article under scrutiny is written in a temperate tone and avoids harsh criticism or lavish praise of the candidates, courts are again likely to uphold the newspaper. *See Camarata v. International Broth. of Teamsters, supra,* 478 F.Supp. at 330–31; *New Watch-Dog Com. v. New York City Taxi Drivers U., supra,* 438 F.Supp. at 1251. *Compare Brennan v. Sindicato Empleados de Equipo Pesado,* 370 F.Supp. 872, 878 (D.P.R.1974); *Hodgson v. United Mine Workers of America,* 344 F.Supp. 17, 23 (D.D.C.1972); *Sheldon v. O'Callaghan, supra,* 335 F.Supp. at 327–28; *Hodgson v. Liquor Salesmen's Union, Local No. 2,* 334 F.Supp. 1369, 1377 (S.D.N.Y.), *affirmed,* 444 F.2d 1344, 1350 (2d Cir.1971). Several courts have also rejected challenges to particular articles because, *inter alia,* they did not immediately precede the election. *See Camarata v. International Broth. of Teamsters, supra,* 478 F.Supp. at 330–31; *Murphy v. Operating Engineers, Local 18, supra,* 99 L.R.R.M. at 2123; *New Watch-Dog Com. v. New York City Taxi Drivers U., supra,* 438 F.Supp. at 1252; *Morrissey v. Curran,* 356 F.Supp. 312, 315 (S.D.N.Y. 1973). *See also Sheldon v. O'Callaghan, supra,* 335 F.Supp. at 327–28.

Nor is the court persuaded by Balanoff's more sophisticated attacks on the manner in which the Secretary applied the foregoing factors to *this* case. As to the content of the articles, Balanoff contends that they deal with a mere "ribbon-cutting" ceremony involving an obscure local union president; similar union hall openings, Balanoff continues, have not received such attention. Indeed, to the extent this opening was significant and merited the attention it received, it was only because President McBride decided to attend what was nothing more than a campaign event for Parton.

Balanoff further disputes the claim that *Steelabor*'s accounts were neutral and dispassionate. He argues that Parton's name and picture appear much too often for this claim to be tenable,[7] and that Balanoff's own name is never mentioned once, though *Steelabor* traditionally refers to the District Director most connected with a given story as a matter of courtesy.

Finally, plaintiff wholly rejects the Secretary's "timing" argument. Under Balanoff's theory of the case, at the start of the District 31 race, Parton was a virtual unknown who desperately needed to build name recognition. The timing of the *Steelabor* articles could not have been better suited, plaintiff argues, for this goal.

To test the veracity of most of these claims, the court would necessarily have to convene a trial to examine the background of the District 31 election.[8] *Bachowski* clearly forbids this procedure, and for this reason alone, plaintiff's contentions must fail. Furthermore, even if plaintiff's arguments are credited, they evidence nothing

---

7. The court finds it disturbing that the Secretary's description of the December 1980 article is not wholly complete. Though the Secretary mentions and describes the one picture of Parton that appears in the November article, the Secretary inexplicably fails to mention that the December issue contains two pictures of Parton, one in the company of President McBride. The court has nevertheless decided not to remand the case for further findings. It is apparent from the Secretary's initial memorandum in support of his motion for summary judgment (page 40) that the Secretary will not initiate litigation even if forced to acknowledge the two

December pictures. Since the court is convinced that such a determination would be rational, a further remand would not, at this stage of the case, be in the public interest. "[E]ndless litigation concerning the sufficiency of the written statement is inconsistent with the statute's goal of expeditious resolution of post-election disputes." *Dunlop v. Bachowski, supra,* 421 U.S. at 575, 95 S.Ct. at 1861.

8. Live testimony would be particularly necessary since the USWA disputes many of Balanoff's assertions.

more than a difference of opinion. Balanoff has not shown that the Secretary was clearly wrong, and the Secretary is accordingly entitled to judgment.[9]

### III. *Order*

For the reasons stated, the court grants the Secretary's motion for summary judgment, the Secretary's motion for a protective order, and the USWA's motion to intervene. The court denies plaintiff's motion for summary judgment and his motion to strike the USWA's submissions. The case is dismissed.

It is so ordered.

---

**9.** According to Balanoff's attorney, several employees of the Department of Labor expressed a belief during the course of their investigation that the *Steelabor* articles were illegal. Even if true, the Secretary was not estopped from overruling his staff.